UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

STATE OF CONNECTICUT                    :

                                        : ss: Bridgeport, Connecticut

COUNTY OF FAIRFIELD                     : August 2, 2021

AUG 2 2021 AM 10:59
FILED - USDC - BPT - CT

**Affidavit in Support of**
**Criminal Complaint and Arrest Warrant**

I, Kevin Hart, being first duly sworn, hereby depose and state:

**Introduction and Affiant Background**

1.      I submit this affidavit in support of a criminal complaint and arrest warrant for

**Jhanannie Singh**, a.k.a. "Jasmine Singh," a.k.a. "Sharmala Persaud"  (b. 1969) for obstructing

and endeavoring to obstruct the due administration of justice, in violation of Title 18, U.S. Code,

Section 1503, and for tampering and attempted tampering with a witness by intimidation, threats,

and corrupt persuasion, in violation of Title 18, U.S. Code, Section 1512(b)(1) (the "**Target**

**Offenses**").[1]

2.      I am an investigative or law enforcement officer of the United States within the

meaning of Section 2510(7) of Title 18, United States Code, in that I am empowered by law to

conduct investigations of and to make arrests for offenses enumerated in Title 18, United States

Code, Section 2516.

3.      I am a Special Agent of the Federal Bureau of Investigation (FBI), and have been

so employed since January 2021. I am presently assigned to the FBI's Transnational Organized

---

[1] As I have been informed by the prosecutor assigned to this investigation, the Second Circuit
has "defined 'corrupt persuasion' under § 1512(b) to mean persuasion 'motivated by an improper
purpose.'" *United States v. Veliz*, 800 F.3d 63, 70 (2d Cir. 2015) (citing *United States v. Gotti*,
459 F.3d 296, 343 (2d Cir. 2006); *United States v. Thompson*, 76 F.3d 442, 452 (2d Cir. 1996)).

Crime Program in New Haven. The FBI is the lead agency in that program, which comprises federal, state, and local law enforcement personnel, and which is tasked with eliminating transnational organized crime groups that pose the greatest threat to the national and economic security of the United States.

4.      During my experience in law enforcement, I have participated in investigations of diverse crimes, executed search and arrest warrants, conducted electronic and physical surveillance of individuals involved in illegal activity, analyzed records, and handled cooperating sources among other duties.

5.      I have participated fully in the investigation described herein, and as a result of this participation and information received from other law enforcement officers, I am thoroughly familiar with the investigation and the information set forth in this affidavit. The information contained in this affidavit is based on the investigation to date, which includes, but is not limited to, my observations, my personal knowledge of and involvement in the investigation, public records checks, my training and experience as a criminal investigator, and my conversations with other law enforcement officers and investigators. Because this affidavit is submitted for the limited purpose of establishing probable cause for the requested criminal complaint and arrest warrant, I have not included each and every fact known to me concerning this investigation. I respectfully submit that the facts contained in this affidavit, however, establish probable cause to support the requested criminal complaint and arrest warrant.

6.      Based on the facts set forth in this affidavit, there is probable cause to believe that Jhanannie Singh committed the Target Offenses.

2

7.      Venue is proper in the District of Connecticut because "[a] prosecution under this section [1512] or section 1503 may be brought in the district in which the official proceeding ... was intended to be affected." 18 U.S.C. § 1512(i).

## Probable Cause

8.      On February 16, 2021, a federal grand jury sitting in Hartford returned an indictment charging Singh with violations of 18 U.S.C. § 371 (Conspiracy), 18 U.S.C. § 510(b) (Exchanging, Receiving, or Concealing Stolen Bonds of the United States), and 18 U.S.C. § 2314 (Interstate Transportation of Stolen Property). Case No. 3:21CR30 (KAD) (RMS). The charges concern an alleged conspiracy beginning around September 2020 and continuing through January 2021 in which Singh and an associate who was also charged in the indictment, referred to herein as Cooperating Defendant 1 (CD-1), stole U.S. savings bonds from an elderly woman who had purchased the bonds for her grandchildren.[2] Singh had worked for the woman as a home health aide, and she stole the bonds after the woman died. Singh then delivered the bonds to CD-1, who would transport them from New York to Connecticut, where CD-1 would meet with another individual (a cooperating witness, the CW) and an undercover law enforcement officer posing as a bank manager (the UC). CD-1 would sell the stolen bonds to the UC with the intent that the UC would fraudulently redeem the bonds at a financial institution. CD-1 would then receive funds from the UC that the UC had purportedly obtained from the fraudulent redemption of the stolen bonds. CD-1 would retain a portion of those funds and transmit a portion of the funds to Singh.

---

[2] Additional information about CD-1 is provided below. This affidavit will refer to CD-1 using male pronouns regardless of his or her actual gender.

9.     Singh and CD-1 were arrested in connection with the offenses above on January 29, 2021, based on a complaint filed on January 28, 2021. They were both released on bond, with Singh to be supervised in the District of New Jersey, and CD-1 to be supervised in the Eastern District of New York. Singh's pretrial supervision was later transferred to the Eastern District of New York.

10.     On or around June 18, 2021, investigators learned from CD-1's counsel that Singh had called CD-1 and asked him to lie and blame the CW as the creator of the scheme and the reason the scheme occurred. At that time, an investigative team separate from the team investigating the stolen bonds was established to investigate the possible witness tampering that CD-1 had reported. CD-1 agreed to provide information to law enforcement with the hope that he will receive favorable consideration at sentencing in the stolen bonds case, and favorable consideration of his potential application for legal immigration status in the United States.

11.     On June 25, 2021, agents met in-person with CD-1 in New York City, with CD-1's counsel present by phone, to interview him about the communications he had had with Singh. CD-1 stated Singh had made a WhatsApp audio call to CD-1 earlier that week. CD-1 stated that Singh wanted him to alter his story regarding the stolen bonds, and that she was attempting to persuade him to do so through money and/or violence. Singh proposed that CD-1 blame the stolen bonds on an individual later identified as the CW who had assisted in the stolen bonds investigation, and she told CD-1 that he would be compensated financially if he told authorities that he had received the bonds straight from the CW. Singh also alluded to having a friend named "Dred" who owed her a favor if CD-1 was not willing to comply. Dred was known to CD-1 as a violent individual. Singh reminded CD-1 that she had family in Guyana (where Singh and CD-1 are both from) if CD-1 happened to be deported. Singh made threats about the CW to

CD-1. Singh wanted the CW's address and told CD-1 that if she went down, then the CW was going down with her.

12.     WhatsApp is a messaging app that lets users text, chat, and share media, including voice messages and video, with individuals or groups. CD-1 had saved Singh's number, known to me and ending in -6311, in his WhatsApp contacts under the name "Sharmala," an alias of Singh's. CD-1 provided agents access to his WhatsApp call log with Sharmala, which displayed a total of nine missed calls from Sharmala to CD-1 between June 21, 2021 and June 23, 2021.

13.     CD-1 agreed to work with agents and to record further telephonic communications with Singh. Agents provided CD-1 with a digital voice recorder on June 22, 2021. Agents instructed CD-1, and he agreed, to record any future audio communications between himself and Singh.

14.     On July 22, 2021, after being informed that CD-1 had recorded several calls with Singh, agents met with CD-1 in person to conduct a second interview and to collect the consensual recordings. CD-1 provided agents with audio recordings of seven calls between him and Singh that occurred between June 25, 2021 and July 22, 2021. CD-1 also summarized Singh's attempts to persuade CD-1 to alter his story to clear her name. Singh had instructed CD-1 to say that the bonds were from the CW and that they were located in the CW's house. CD-1 asked Singh how he would profit by agreeing to this. In response, Singh said she would take care of CD-1 financially once she was back on her feet. Singh again mentioned her friend Dred, and that once the case was over, Dred would wait under a car for the CW in Brooklyn, which CD-1 understood to mean Dred would ambush the CW and cause him physical harm.

15.     I reviewed the audio recordings and determined they were consistent with CD-1's account. For example, in a recorded call that took place on or about July 6, 2021, Singh stated,

"He pray to god that I don't fucking see him and lose it, that's when I'm going to go to jail for real." Based on discussions with CD-1, agents determined that Singh was referring to the CW in that comment.

16.     In a recorded call on or about July 12, 2021, Singh stated, "They say anything happen to me, [the CW] is going to pay the consequences later."[3] Based on discussions with CD-1, agents determined that "they" in this comment referred to Singh's acquaintance mentioned above, Dred. CD-1 described Dred as having a crew.

17.     In a recorded call on or about July 16, 2021, Singh stated, "They said they gonna sleep under the car in fucking Brooklyn, they going to. They said don't think that whatever he did to us he gonna get off or what he gonna … they said 'No!,' it not start yet." CD-1 understood this to mean that Dred was waiting to target the CW in Brooklyn as retribution for the CW's assisting law enforcement in the investigation of Singh.

18.     In a recorded call on or about July 16, 2021, after Singh explained that CD-1 should blame the CW for the stolen bond scheme, CD-1 asked Singh, "So I got clear … I got for clear … clear your name?" Singh replied, "Yeah … you didn't get nothin' from me, yeah." CD-1 asked Singh "If I gonna lie, what you gonna give me?" Singh replied, "You know I will never let you down. Whatever I get I will give it to you. I am fighting for all the money back, and it's going to go to you…. If you say that, we gonna get all the money back. And I'm not gonna take it, I'll give it to you." CD-1 described this exchange as Singh promising to benefit him financially if he lied and changed his story about the bond scheme.

---

[3] Both Singh and CD-1 speak English with a Guyanese dialect.

**Conclusion**

19.     Based on the information in this affidavit, there is probable cause to believe, and I

do believe, that Singh committed the Target Offenses. Accordingly, I request that the Court issue

a warrant for her arrest.

Respectfully submitted,

Kevin Hart
Special Agent, FBI

Sworn and subscribed to before me on
August 2, 2021, in Bridgeport, Connecticut.

/s/ S. Dave Vatti
HON. S. DAVE VATTI
UNITED STATES MAGISTRATE JUDGE

7